teeniers in New York City as Lou lost connection. At this time we will hear Martinez from New York City transit authority. Good morning, I'm Charles Emanuel. If there was ever an employment case that should not have been tried on paper, I respectfully submit it is this one. Just take a look at what was submitted by transit in support of the motion. They submitted no fewer than approximately 400 purported statements of undisputed material facts with their motion for summary judgment. My clients came back and not only responded chapter and verse, deposition and declaration and document to every single one of those, but in each of those categories my clients came back with additional disputed facts pursuant to rule 56.1. The MTA then came back in reply and cited responses to certain of the facts that we had put into dispute, but not others. And if you take a look at their brief, the same thing occurs. The MTA selected particular facts and matters that they thought would support their position. But they left open the entire breadth of disputed facts that we had cited chapter and verse in our papers. A simple review of the 56.1 statements I submit and the supporting documentation will demonstrate why these cases must go to trial. I read again last night a case cited by transit. It was an opinion written by judge pooler and it's in the Bernie case. And I think that is very instructive on some of the issues of fact here. Transit cited Bernie for certain propositions, but in each case they left out the sentence or the paragraph that followed what they quoted from judge pooler. So let me take a closer look at this. This is a statement that was made. In Bernie it was stated that the employer's disregard or misjudgment of a plaintiff's job qualifications may undermine the credibility of the employer's stated justification for the employment decision. Here job qualifications are at issue. Transit says that my clients may not testify alone to their job qualifications and to their performance. Okay. Although they don't simply give an opinion and the case cited by transit refers to an opinion regarding job qualifications. My clients state very, very specifically what their qualifications were and what their performance was and it is all corroborated by other people who participated in performance reviews, who attended seminars that my clients were involved in and who were at every turn stating positive things about my clients. It is a rare employment case indeed where the defendant cannot point to a single performance defect in any of the plaintiffs. These individuals dedicated... I'm sorry, but if you have a reduction in force, which is often a tragic circumstance for large numbers of people who are going to lose their jobs, many of them are going to be qualified people. It's just a question of whether other people are more qualified and we are warned not to become a super personnel office where we're going to rank this person's qualifications. We don't even know what these people do without knowing whether they do it well. Your Honor, I think there's something on that point in the Bernie decision as well. The court in Bernie stated that the fact that there is a decision made by the employer that purportedly is based upon certain criteria does not mean that there cannot be a closer review. Here we have pointed out two things, Your Honor. Number one, these persons did not lose their jobs in the RIF. Their jobs were taken from them before the RIF, typically weeks to months before the RIF rankings were ever done. Are you talking about being transferred to other departments? Yes, transferred and reviewed in other departments by people who had never dealt with them before. But they didn't actually lose their jobs. They just suffered some what you would describe as adverse consequences. Their job functions were taken from them. I think that really does mean having their jobs taken and losing their real jobs. They were still on the payroll, however. They were still on the payroll. But what that shows, Your Honor, is that the RIF is a pretext in this case in pristine form. The RIF simply became the way to show them to the door when they had already been moved out. You're not denying that the       No. Okay. And you're not denying that they were running at their costs, are you? I know that you claim that it was due to mismanagement, but be that as it may, they were running at a deficit, weren't they? They report running a deficit. But, Your Honor, we are so skeptical of everything that they have to say that there is nothing supporting that assertion of a deficit other than the specific false statement of an employee from Human Resources who said that there was a deficit caused by reduced real estate tax revenues. We have demonstrated that that is an outright falsehood, and it is proffered by someone who has no knowledge of the facts. We cannot simply make the assumption, oh, it's a public agency, we must take it as true. Not when we have seen misstatements galore as we have seen here. Not when we see in transit's answering brief the assertion that this burden was shared by bus drivers and many other employees, only to see in a case that was argued by Mr. Drinan that, in fact, the very month that my employees received their last paycheck, the bus drivers and 140 new ones were brought back into transit. I don't trust them, Your Honor. This is an issue of fact as to whether this was a legitimate reduction in force. Well, as you say, if the RIF was a kind of scheme to exclude and weed out older workers, then how can it have been that so many younger workers were dismissed at the same time on the basis of the same rankings? That's not really what I'm saying. How many older workers were not dismissed as well? That's not really what I'm saying, Your Honor. First of all, I would point this out. This case is not a case of disparate impact. It's in disparate impact cases that the numbers game becomes paramount, where the assessment of numbers of employees in different categories becomes an issue. And I'm aware that all of the judges on this panel have  the past. This is a case of disparate treatment. And the numbers game, if you will, does not apply in this case. We could not, did not, and are not required to, in this case, assess the overall numbers proffered by transit. But if you want to take a look at what they have proffered to you, take a look at pages 48 to 49 of their brief. They give you a series of lists of ages of people. They don't cite a single piece of paper to back that up. We did a little looking on our own to see if we could do them a favor. There are certain documents in the record that loosely tie into one or two parts of this, but there's nothing in the record to support it. So why can we rely upon those figures? And that's really not what our case is about. It is very, very possible for an employer to decide to terminate certain employees because of age. Not others. Did the district court rely on those ages? I believe it did. I'm quite sure it's in the district court's opinion specifically referring. Is there a citation in the district court's opinion to what the district court was relying upon? I'm sorry? Did the district court cite something in support of those ages? I will have to take another look. I'm not certain. Anyway, you have reserved rebuttal. We'll hear Mr. Drinan. Very good. Good morning. May it please the court, my name is Robert K. Drinan. With me is Catherine Martin. We wrote the brief. I litigated the aspect of the rift that involved the department of subways. Ms. Martin had to step in after discovery and do the written portion of the motion below and I'm going to read the brief here. And we certainly disagree that we've been selective in presenting the facts. We don't think that's our problem in this case. But to respond to the remark about the case that I argued in the second department, there were two cases and in some ways they are relevant to what happened in the rift. At some point... Those cases arising out of the same rift? Those cases involved employees represented by the transport workers union and they were laid off and they had a right of recall. In this same set of transactions? Yeah. The president was notified in April and they began layoffs in May. These sets of transactions? Not directly here. Not directly... Concentrate on what we have here. Okay. Very good. Because we have enough on our plates with this one without going to two other cases. Very good. Our view of judgment, we would submit that the pretext is not an issue. It is an issue that what was omitted from the appellant's brief is OMB's role, the office of management and budget. What was omitted was the fact that when Mr. Prendergast came and was appointed president in December of 2009, that shortly thereafter, he ordered a 15% reduction in the administrative staff. Meanwhile, the affidavits from Aaron Stern, who was the head of... That's the administrative staff that's distinct from, say, bus drivers? Yes. That's distinct from the administrative staff. And it was a separate capital program as well. Those separate budgets. Right? And OMB evaluated the entire agency, including the office of OMB and the office of the president. And they gave hard numbers at some point in time. And what they did was, because the budget had been reduced, they looked and targeted certain areas and they said, your budget is now this. You have this many people overbudget. You need to reduce your budget by that many people. OMB did not give names. They simply gave a hard number and it was left to the departments to sort that out. So with respect to the pretext and the fact... Wouldn't it be a lot easier to reach those numbers if you got rid of the people who made more money and wouldn't that closely correlate with people who were older? Yep. That's probably true, judge. There are probably a lot of ways to run a riff and probably one is no more fair than the other because someone is going to get laid off and probably some good people, as the people here were, were laid off. So even if there are higher paid employees, that person may have a lot more responsibilities and may be really terrific at his or her job. The claim saw that the riff itself was very subjective. Many of the categories were subject to the employer's desire, if it was so, to get rid of the older, higher paid employees. Years of service in one of these was only given a multiplier of four when another category was given a multiplier of 12. Is that correct? Yes. There were objective categories and they were weighted. That devalues long-term employees. It might. There's the countervailing view that simply because someone has a job for a long time doesn't mean they're the best qualified. You want to evaluate them based upon how they perform in their job. I understand that. And we're not micromanaging. But someone decided what the multipliers were for all these different subjective or many subjective categories. Yes. And in subways, it was noonan, Pam noonan and some other people that sat down and took that riff booklet and modified it for subways and they did weight the categories in ways that they thought was appropriate. And it may be that the weights could have been different and maybe things would have worked out differently. But someone would have been terminated anyways because the numbers were hard. And in subways, they were going to lose 17 professional technical engineers and 12 clericals. It would have happened no matter what those weights were. But to the point that one category is weighted less than another, it may indicate that they don't value experience as an influence, but it doesn't indicate that age is a factor. And in subways, for example, once the booklet was distributed and it was all done in secret, which they have a problem with, you look at who evaluated the individuals. Did the individuals who evaluated them and applied the criteria in the book, did they do that in a way that in some way reflected age animus? Mr. Manuel argues that people were transferred to other departments and evaluated by people who didn't know them and therefore could not value them appropriately and would probably prefer to keep the people who know what's done in that department and therefore people were set up for this and following up on what judge Pooler is saying. I'm not sure it's the case here. But if you ranked low seniority and you ranked high as a ground and you factored in considerably how much money people make, you would end up with firing the elderly people. Assuming elderly is over 40. I'm not sure about the conclusion but it would be true that if they were evaluated by somebody that didn't know them that that would be an issue. That's not the case here. With respect to subways, miss Kirkland had been in organizational development and was new president Howard Roberts. He reorganized. He created workforce development. He moved Laurie Hoffman who was the vice president out of organizational development somewhere else and he took the staff, put them in workforce development in 2008. Miss Gutierrez who was in operations training which at that time was under human resources, operations training includes mandatory track training for employees in subways and they were moved to workforce development. When Prendergast came back and the budget was $350 million going up toward a billion, he eliminated workforce development. At that point those employees needed a home in the organizational chart. It wasn't a mystery. They knew and the testimony shows they knew in December when they read the memos from the president and miss Gutierrez knew there were people being laid off. She saw the station agents coming to her building in Brooklyn and being laid off from there. She knew this. So to find a home after Prendergast came in and they also knew that workforce development would be limited. They had heard that. And so eventually operations training was moved on to subways. And miss Gutierrez had the same supervisor who turned out to be her husband and evaluated her and had signed her, lived in her house and worked on her house for a number of years and miss Kirkland was evaluated by mark Hellman. Ultimately she was evaluated by somebody else who apparently thought she was better than her husband did. They all knew each other and so at some point they asked him to evaluate her again and he did and he gave her three more points. And at this point it's all done in blind because no one knows, they didn't know for sure if anyone would be laid off. They didn't know what the scores were going to be in comparison to anyone else because the employees being evaluated were all over the place. No one knew. No one knew what the comparatives were. They didn't know what was going to be a good score or a bad score. So they did the best they could. And with respect... We're all familiar with the jurisprudence about stray remarks. But I'd like you to comment on Debra English's claim that Malik Sohaibab, is that how you pronounce his name, who raided her in the RIF told her at the time of the RIF that, quote, people who are eligible to retire should retire and make room for the younger generation. Can't we draw from this an assumption that he was biased in favor of younger employees? All right. That's obviously Malik denied the remark. But it is in the record. She testified. But we have to accept this as true, do we not? Yes. Understood. So that obviously is a troubling remark. It could be a troubling remark. When you look at the context of Ms. English, right, and these are undisputed facts, she had been in the print shop. And there was an evaluation from 2007 in the appendix at page 346. And her evaluation in 2008 for 2007 was that she was going to assist in a print shop application that was expected to be completed by December 30th, 2008. No one is saying that she didn't do a good job. But that was the expectation that was reflected in her performance evaluation for 2007. That print shop application wasn't completed. And it's also what Ms. English's role was. She was an intermediary. She was working with the clients and sending over to the coders. They were preparing the application. Counsel, all this sounds like fact questions. Isn't Debra English entitled to tell her story to a jury and Malik tell his story? These are fact questions. You're arguing about facts on this motion which is not facts are not related. This is summary judgment. Facts to the left of me, facts to the right of me. And you're saying that we should affirm. I'm saying that if you look at her job that she didn't know coding when she went over to the internet technology group and even she said at page 136 that that was a step up. They were doing web design. She couldn't do that. She took a course. When you look at her overall evaluation, it wasn't by Malik. It was by Shireen Ali. She was not evaluated by Malik? No. Ali reported to Malik. So there is a connection, yes. She was evaluated by Malik, wasn't she? I thought Ali evaluated her. Okay. My mistake if that's the case. Our view is that in the context that that would be a stray remark. Context is facts. Look at it in context. This is a summary judgment motion. Well, the context would also be her action. We don't find facts in this court. You know that, don't you, counsel? I do, judge. So you are arguing facts to me? We would say that the lower court was correct in determining that it wasn't a substantial piece of evidence given all the other evidence in the case that was found to be true and accurate that would be entitled to a jury trial. Thank you. Thank you very much. Thank you. First of all, what was said about Ms. English is simply incorrect. Malik misstated the facts. I can call it nothing but an outright lie. We are not finding facts even. Mr. Malik came forward and said that she had underperformed and was untimely on the project. It was the exact opposite. The person who took her job, Shireen Ali, was subsequently behind on the project by one to two years. Deborah English was commended time and time again on her performance. Next issue. I would like to point out a couple of things with respect to the reassignment of people. It is not quite so much a matter of who was reviewing these individuals, although in every single case it was not, as provided in the guidelines, the person who had most direct dealings with that particular plaintiff. But it is not so much that as the fact that when they were moved into other groups, the people who were scoring everyone else in those groups were not people who had any familiarity with my clients and who were applying different criteria when they scored those people. Prime example, Gutierrez and Kirkland. Moving from workforce development. Unbeknownst to them, they did not know they had been reassigned to what they call an artificial concocted group called subway clericals. Moved into that group, they got scores which were good solid scores of about 630 to 650 on a scale of 800. If that were the SAT, that would place you at the 90th percentile but not in the group they were moved to. If you take a look... Were they re-rated? No, they were not. No, they were not. They were left with the grades that they had gotten from someone who identified himself as a conceitedly very tough grader, Walter Reuter. Yes, that score was bumped up a bit, but it was bumped up nowhere near the scores that were given to the other people in the group that they had never even heard of. The top people in that group is a group of about 15 to 20 people. Three of those people got absolutely perfect scores in every single category except one. The category where they did not get perfect scores was experience. Gutierrez and Kirkland, with many years of experience at transit, doing their jobs perfectly well, showing up every day, no blemish on their record, et cetera, et cetera, et cetera, get very good scores. All of a sudden, from out of nowhere, very inexperienced people, people who have been there for a much shorter time, are getting perfect scores across the board. How can you possibly compare? I understand your perspective that this transfer affected the RIF rating, but so would you have to prove in order to win a trial, would you have to prove that the transfer itself was motivated by an age discriminatory purpose? Yes. That's your intention, to prove that the transfers were? That's exactly what I think we will accomplish, your honor. All right. Now, just a couple of other No, no, no. We've heard argument. Thank you both. All right. We'll reserve decision.